IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LILIAN ONOH, | § | |
|    PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. _____ |
| | § | |
| SAHARA REPORTERS MEDIA GROUP, | § | |
| INC. and LA KIESHA LANDRUM-PIERRE, | § | |
|    DEFENDANTS. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Lilian Onoh, and files this Original Complaint and show this Court as follows:

**Parties**

1. Plaintiff Lilian Onoh (hereinafter "Onoh") is an individual who resides in Tarrant County, Texas.

2. Defendant Sahara Reporters Media Group, Inc. is a New York corporation which does business through internet publications and may be served through its Chief Executive Officer, La Kiesha Landrum Pierre, 3648 East Long Ridge Drive, Orange, California 92867. Defendant Sahara Reporters Media Group, Inc.'s principal place of business is located in the State of New York.

3. Defendant La Kiesha Landrum-Pierre is a California resident who may be served with process at 3648 East Long Ridge Drive, Orange, California 92867.

**Jurisdiction and Venue**

4. Pursuant to 28 U.S.C. § 1332, this Court has subject-matter jurisdiction over this action. This Court has personal jurisdiction over the defendants given that the complained

of conduct occurred in the State of Texas.

5.      Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this District and Division.

### Facts

6.      Lilian Onoh is a citizen of Nigeria who was a career diplomat/civil servant for thirty years from 1993 to 2023. Ms. Onoh served as the Nigerian Ambassador to Namibia and the Head of Mission in Jamaica. Ms. Onoh also served as a diplomat at the Permanent Mission of Nigeria to the United Nations in New York.

7.      Since 2021, Ms. Onoh has been a legal resident of the State of Texas. Ms. Onoh intends to settle here permanently once her Permanent Residence Card is issued.

8.      Defendant Sahara Reporters Media Group, Inc. ("Sahara Reporters) is an online news publication which mainly focuses on African news. Sahara Reporters publishes on a website named "saharareporters.com". Upon information and belief, Plaintiff understands that Defendant Landrum-Pierre is the Chairwoman of Sahara Reporters and has been the interim Chief Executive Officer of Sahara Reporters since 2017.

9.      On or about April 21, 2023, Sahara Reporters published a story on its website concerning Ms. Onoh ("Article"). The title of the Article was:

## Nigerian Civil Service Commission Sacks Former High Commissioner To Namibia, Lilian Onoh, Over N50million Misappropriation, Recommends Trial By ICPC

10.     To make sure that the readers did not mistake about whom the article concerned, Sahara Reporters included a photograph of Ms. Onoh:



11.     Initially, the article notes how Sahara Reporters had previously reported that Ms. Onoh had been accused of illegally diverting funds meant for the day-to-day operation of the Nigerian mission and was asked to refund the sum of $45,539.11 (about N19 million), $70,448 (about N30million), and N614,000.

12.     The article then claims that the Nigerian Federal Civil Service Commission fired Ms. Onoh in 2021. Sahara Reporters next claimed that a "*report by a seven-man committee indicted the controversial former Nigerian High Commissioner to Namibia over her alleged financial misappropriation while serving in the Southern African country*".

13.     Sahara Reporters noted that Geoffrey Jideofor Kwusike Onyeama and Gabriel Taminu Aduda were members of this committee.

14.     Sahara Reporters also claimed that the committee directed that Ms. Onoh be referred to the Independent Corrupt Practices and other related offences Commission (ICPC) for investigation. Sahara Reporters also referenced two alleged letters regarding Ms. Onoh's dismissal that this Commission sent to Ms. Onoh detailing the reasons for her termination. The article further stated that this Commission ordered Ms. Onoh to refund to the Nigerian mission all the money that she had improperly used.

15. The basis of the Article was statements and claims about Ms. Onoh which Onyeama and Aduda made. The reason for their making false statements about Ms. Onoh was to discredit her following her reporting of corruption by those individuals.

16. Specifically, as an Ambassador, Ms. Onoh had reported multiple incidents of embezzlement of millions of U.S. Dollars and Billions of Naira of Nigerian Government funds by various Nigerian officials. Further, she reported the embezzlement of $2.8 Million Dollars in Red Cross Funds meant for Haiti earthquake victims as well as the egregious acts of visa racketeering against the USA and other countries in which her successor in Jamaica had engaged. Moreover, Ms. Onoh reported incidents of Value Added Tax ("VAT") fraud against the Namibian Government in which Ms. Onoh's predecessor in the Nigerian mission in Namibia had engaged.

17. Due to their complicity in these acts, Onyeama and Aduda actively covered up these crimes and lashed out against Ms. Onoh in a vicious campaign to destroy her career and reputation.

18. In fact, Onyeama and Aduda attempted to have Ms. Onoh arrested for reporting the visa fraud against the United States and other countries by the Ambassador that succeeded her in Jamaica. Although Ms. Onoh was able to thwart that attempt, Onyeama and Aduda continued to press their attack on Ms. Onoh by making false claims in public and to Defendant Sahara Reporters and Defendant Sowore while attending conferences at the United Nations in New York initially in September of 2021 and continuing into early 2022.

20. The claims that Sahara Reporters and Defendant Sowore made were wholly false.

21. Ms. Onoh was never terminated from any posting with the Nigerian government for misappropriation of funds. In fact, the reasons for Ms. Onoh's termination are easily discoverable as Ms. Onoh filed an appeal and legal proceedings in Nigeria challenging her

termination. No one on behalf of the Nigerian government involved in Ms. Onoh's posting or the termination thereof contended that misappropriation of funds was the cause of the termination.

22. Onyeama did not create a seven-person Committee to investigate Ms. Onoh, nor did Aduda head up any such Committee. In fact, such Committee was never impaneled to investigate Ms. Onoh by anyone.

23. No Committee made any demand on Ms. Onoh to refund or return any money.

24. The April 2023 article was essentially an update of an article that Sahara Reporters had printed in September of 2021. Following the September 2021 publication, Ms. Onoh's counsel, Mr. Kekere Akpe, sent Omoyele Sowore, then Chief Executive Officer of Sahara Reporters, a letter demanding an apology and a retraction. However, Sowore refused.

25. Ms. Onoh's attorney also demanded that Sahara Reporters and Sowore print the actual letters from the Committee and the alleged report. Again, Sahara Reporters and Sowore refused.

26. To date, Sahara Reporters has failed to produce any documents or reports authenticating any of the allegations made in the April 2023 publication.

27. Therefore, Sahara Reporters knew prior to the April 2023 publication that the facts stated in the September 2021 publication were false and malicious.

28. Sometime in 2017, Defendant Landrum-Pierre became the Chief Executive Officer of Sahara Reporters. On or about December 28th 2023, the Defendants republished the entirety of the April 2023 Article in their report of a lawsuit lodged by the Plaintiff, repeating the full facts on the case, the false statements about Ms. Onoh contained in the Article, the name of the judge, the venue, and the location of Ms. Onoh

29. On or about November 7, 2024, the Defendants again republished the false statements about Ms. Onoh in a new article entitled: *"Ex-Nigerian Ambassador Onoh begs for US Green Card Over Sahara Reporters' Corruption Report, Tells Texas Court 'I Want To Stay Here Permanently, I can't Sleep Or Even Join Church Choir"*. The Defendants published this article on its website, its Facebook page, its Twitter/X account and syndicated to approximately 10 other websites. This new publication also added false claims that Ms. Onoh had been suspended by the Nigerian government for fraud. This November 2024 article went on to add additional untruthful comments about Ms. Onoh's career and her family.

30. Between November 7, 2024 and January 14, 2025, Defendants have published at least three different articles about Ms. Onoh repeating the false statements made in the November 7, 2024 article. Such articles carried titles such as: *"Nigerian Diplomats' Lavish Allowances Exposed: Ex-Ambassador Reveals N150Million Monthly, N216Million Ad-hoc Payments In U.S. Court Affidavit"* and *"Sahara Reporters and Sowore Defeat Ex-Nigerian Ambassador Onoh In U.S. Court Amid Claims A Corruption Report Made Her Seek Asylum"*. Each time, the Defendants also posted these articles on Facebook, Twitter, Instagram and other such social media platforms. Further, the Defendants syndicated these articles to multiple other websites. In these articles and social media posts, the Defendants make multiple references to Ms. Onoh's residency in the state of Texas and identify the events that are occurring in this state.

31. Moreover, due to the Defendants' continued attacks on Ms. Onoh, other individuals have started making threats toward Ms. Onoh in the comments sections for those articles. One such commentor even threatened Ms. Onoh's safety if she were to return to Nigeria by claiming that she has "a target on her back".

32.     As a result of the Defendants' repeated conduct, Ms. Onoh has suffered severe economic and personal injuries. Specifically, Defendants' publishing and re-publishing of these lies not only impacted Ms. Onoh in the United States, but also in Nigeria and throughout the rest of the world.

33.     First, Ms. Onoh's reputation has been completely destroyed. Because of Defendants' actions, Onoh will never be able to work in the diplomatic field again where she had dedicated 30 years of her life. As a result, Ms. Onoh has lost employment and the annual income and allowances earned by Nigerian Ambassadors in the United States worth approximately $11,145,179.05 over the next ten years not including cost of living adjustments or any increases in allowances.

34.     Additionally, Onoh suffered severe mental anguish and distress from the Defendants' publication. Such damages include the loss of friends and colleagues who either believed these lies or simply wanted to protect themselves from being targeted by association. Ms. Onoh had to start hiding her identity and using a pseudonym when she met new people so that they would not look up her name and see the Articles. As a result, Ms. Onoh's social life is practically non-existent with even a simple act of providing her driver's license causing extreme anxiety.

35.     Ms. Onoh has lost approximately $172,000.00 invested in a business she had started creating in Nigeria for her retirement as she cannot return to Enugu, her home state in Nigeria, to operate this business.

36.     Ms. Onoh has also been under constant physical and emotional distress related to the fear and anxiety the Defendants' have caused. Each republication and syndication thereof

reinforces the lies Defendants published as truth in the minds of those who read it and adds more people to the group who wrongly believe that Ms. Onoh is a thief. Defendants' behavior

## Count I. Defamation

37. Onoh incorporates paragraphs 6 – 35 as if set forth at length.

38. By publishing and re-publishing the defamatory statements on its website and other social media platforms, Defendants published false statements about Ms. Onoh to literally the entire world. Defendants either knew or should have known that these statements were false at the time they made them to these third parties. As a result of Defendants' conduct, Ms. Onoh suffered severe reputational damage, mental anguish, and economic injuries.

## Count II. Intentional Infliction of Emotional Distress

39. Onoh incorporates paragraphs 6 – 35 as if set forth at length.

40. Defendants intentionally or recklessly published the false statements about Ms. Onoh despite having knowledge of its falsity. Defendants' conduct was extreme and outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious and utterly intolerable in a civilized community. As a result of Defendants' conduct, Ms. Onoh suffered severe emotional and reputational damages.

## Damages

41. Due to the Defendants' conduct, Ms. Onoh has suffered severe emotional and reputational damages. Additionally, Ms. Onoh has suffered total dislocation and isolation from her family, friends, social network, and country due to the security challenges created by the Defendants. Ms. Onoh has also suffered economic damages as these actions by the Defendant have damaged her ability to find employment in the United States and all but

eliminated her ability to work or live safely in her homeland.

42. Defendants' conduct as described herein was done intentionally and with "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. These violations by Defendants are the type of conduct that the State of Texas protects against by the imposition of exemplary damages. Therefore, Ms. Onoh seeks the recovery of exemplary damages in an amount to be determined by the finder of fact that is sufficient to punish Defendants for their wrongful conduct and to set an example to deter Defendants and others similarly situated from committing similar acts in the future.

## Prayer

43. WHEREFORE, Ms. Onoh prays that, upon final determination of this cause of action, she receives judgment from Defendants for:

    43.1    Damages as pleaded;

    43.2    Costs of Court; and

    43.3    All such other and further relief at law and in equity to which Ms. Onoh may show herself to be justly entitled.

Respectfully submitted,

*WESTERBURG & THORNTON, P.C.*
8080 N. Central Expressway, Suite 1700
Dallas, Texas 75206
Phone No.:   214.528.6040
Facsimile:   214.540.7207
Email:       steve@mwtlaw.com

By: _____
Steven Thornton
State Bar No. 00789678

**ATTORNEY FOR PLAINTIFF**